Monica M. PEYTON, Appellee,

v.

Michael F. DiMARIO, The Public Printer of the United States, Appellant.

No. 00–5407.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 4, 2002.

Decided April 23, 2002.

Michael C. Johnson, Assistant U.S. Attorney, argued the cause for appellant. With him on the briefs were Roscoe C. Howard, Jr., U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Theodore S. Allison argued the cause for appellee. With him on the brief was John W. Karr.

Before: GINSBURG, Chief Judge, EDWARDS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Monica Peyton, a former employee of the Government Printing Office ("GPO"), brought this action against Michael F. DiMario, in his official capacity as Public Printer of the United States, alleging employment discrimination pursuant to Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* Peyton's hostile work environment claim and retaliation claim were tried to a jury, which issued a verdict for Peyton and awarded her $482,000 in compensatory damages. The district court decreased the compensatory damages award to the statutory cap of $300,000 in accordance with 42 U.S.C. § 1981a(b)(3)(D). The district court further awarded Peyton $78,476.90 as back pay and $377,615.72 as compensation for lost future earnings. The Public Printer (hereinafter referred to as "GPO") appealed, challenging only the damages and relief awarded. GPO contends the district court abused its discretion by: (1) awarding the statutory maximum in compensatory damages; (2) awarding back pay for a period when Peyton was in school; and (3) awarding future earnings that are unreasonably speculative. We affirm the district court as to its award of compensatory damages and back pay. However we agree with appellant that the future earnings awarded are unreasonably speculative and remand for further proceedings.

## I. Background

### A. Peyton's Employment at GPO

Appellee Monica Peyton worked for GPO for 11 years (from July 5, 1987 to August 14, 1998). She served in various GS–5 and GS–6 positions, including supply clerk and supply technician. In the fall of 1995 she was accepted into a 2–year proofreader apprenticeship program. Successful completion of the apprenticeship program leads to an appointment as a journeyman proofreader. The apprenticeship program consisted of on-the-job training as well as some classroom instruction. Apprentices were evaluated during each 13–week period of the 2–year training program. GPO set specific proofreading standards (e.g., the number of keystrokes that must be read within an hour) and then taught the apprentices how to meet those standards. Throughout the training program GPO provides information to apprentices to allow them to access their reading speed at any time and periodically advises apprentices as to whether they are meeting expectations. Peyton's apprenticeship began in January 1996. Although she apparently failed to meet the number of key strokes per hour during one of the periods in 1996, Peyton continued successfully in the program. Then in 1997, she failed to meet the number of required keystrokes per hour for the July 6–October 4 period.

According to Peyton's evidence, a superior, Charlotte Massey, made lewd comments and gestures concerning Peyton's breasts on more than one occasion. Peyton complained to Massey directly and Massey ranted at her and intimidated her. Thereafter, Peyton made an informal complaint to GPO's Equal Employment Opportunity ("EEO") office on July 1, 1997, and a formal complaint on August 15, 1997. Upon learning that Peyton had filed the informal complaint, Massey engaged in a pattern of harassment, including threats communicated directly and through co-workers. There was physical contact between Peyton and Massey, which Peyton characterized as a bump, or an elbowing, by Massey. Peyton complained to her superiors that her work was being adversely affected by the hostile environment of the proof room, but to no avail. Peyton was even told that she should drop her complaint. Ultimately, Peyton was distressed and fearful about approaching the head desk when Massey was assigned to work there.

According to GPO, Peyton's failure to meet the proofreading goal in 1997 resulted in her being given a 2–week delay, then a 12–week probation to improve. Peyton

in fact began to improve. However, Peyton was misled as to when these probationary periods actually began and was ultimately expelled from the apprenticeship program in what had been represented to her as the fifth week of the scheduled 12–week probation. Peyton was released from the apprenticeship program in January 1998, though not terminated by GPO at that time. GPO placed her in the Library Programs Service, and ultimately she was terminated on August 14, 1998.

## B. Proceedings Below

Having exhausted her administrative remedies, Peyton filed the action below in the district court. In her complaint (filed before she was fired), Peyton alleged sex discrimination in the forms of *quid pro quo* sexual harassment and a hostile work environment, as well as retaliation for pursuing her rights under Title VII. Subsequently she amended her complaint to allege that she was terminated from GPO as retaliation. The district court granted summary judgment for GPO on the *quid pro quo* claim but denied it with respect to the hostile work environment and retaliation claims. Peyton's hostile work environment and retaliation claims were tried to a jury in November 1999. The jury returned a unanimous verdict finding that Peyton proved, by a preponderance of the evidence, each element of her claim of sex discrimination on the basis of hostile or abusive work environment, and retaliation, against GPO. The jury awarded Peyton compensatory damages in the amount of $482,000.

The jury also sat in an advisory capacity on the issues of damages for past lost earnings and benefits, up to the time of trial, and damages for future lost earnings. *See* Fed.R.Civ.P. 39(c). The jury returned an advisory verdict in which it found that plaintiff had proved, by a preponderance of the evidence, that she was entitled to damages for past lost earnings and benefits, and to damages for future lost earnings. The advisory verdict recommended $50,000 for back pay and $840,000 for future lost earnings.

On the issues of entitlement to back pay and future lost earnings, the district court made findings of fact. The court agreed with the jury that Peyton "presented convincing and credible evidence proving that her co-workers' and supervisors' conduct had a material effect upon her ability to perform and upon her quality of life in the workplace." It found no credible explanation for the discrepancy between the timeframe of the probationary training period represented by GPO to Peyton, and the period actually treated as the probationary training period by GPO. The court found the evidence to establish that after being told of her probation on December 2, 1997, until her removal from the program, "Ms. Peyton performed above the required standards." The district court concluded as a matter of law that "[a]s a direct and proximate result of the retaliatory adverse employment actions taken against Ms. Peyton by officials of the GPO, Ms. Peyton failed to be promoted to journeyman proofreader, as of January 2, 1998, and was terminated from her employment with the GPO as of August 14, 1998. She has suffered compensatory damages and a loss of earnings and benefits as a direct and proximate result of these adverse employment actions."

## C. Damages and Relief

Based on its findings, the district court awarded compensatory damages and equitable relief. First, the court reduced the amount of compensatory damages recoverable to $300,000, the statutory maximum under Title VII for an award against an employer with more than 500 employees.

*See* 42 U.S.C. § 1981a(b)(3)(D). The court "determine[d] on the facts of this case" that $300,000 "represent[ed] a fair and appropriate compensatory award pursuant to the statutory cap at 42 U.S.C. § 1981a(b)(3)." In denying GPO's Rule 59(a) and (e) motion for a new trial or, in the alternative, remittitur, the district court rejected the argument that this award of compensatory damages was "grossly excessive" because the case did not present "the 'most egregious' instance of unlawful conduct meriting the 'maximum amount recoverable under Title VII's statutory cap.'" Rather, the court determined "that the jury could reasonably view this case as the type of egregious, unlawful conduct that Title VII was designed to remedy." It distinguished this case from *Nyman v. FDIC,* 967 F.Supp. 1562, 1572 (D.D.C.1997), based on the physical assault of Peyton and GPO's manipulation of "the apprentice training rules in order to expel the plaintiff from the training program." It concluded that the "$300,000 award neither 'shocks the conscience' nor represents a 'miscarriage of justice.'"

The court awarded back pay and future lost earnings ("front pay") as equitable relief. It calculated back pay for three periods: January 2–August 14, 1998 (while Peyton was still at GPO); August 14–October 11, 1998 (from termination at GPO until employment by Bowne, Inc.); and October 11, 1998 to Trial (Peyton employed at Bowne, Inc.). It determined Peyton was entitled to an award of back pay in the amount of $78,476.90. The court rejected arguments by appellant GPO that Peyton inadequately mitigated her losses during the August–October period when she was unemployed. Noting that it is "the defendant's burden to prove that the plaintiff's efforts to secure employment constituted inadequate effort to mitigate damages," the court "conclude[d] that the defendant has failed to demonstrate that the plaintiff inadequately mitigated her losses."

In determining that front pay was appropriate, the court first found that it would be "futile, ill-advised, and inequitable to order that Ms. Peyton be returned to her old position." Relying on our decision in *Barbour v. Merrill,* 48 F.3d 1270, 1278 (D.C.Cir.1995), *cert. dismissed,* 516 U.S. 1155, 116 S.Ct. 1037, 134 L.Ed.2d 113 (1996), the district court calculated projected future lost earnings. It found that at the time of trial, Peyton earned $549.90 less per week ($28,594.80 less per year) working for Bowne, Inc., a private printer, than she would as a journeyman proofreader for GPO. Because the court found that "Ms. Peyton reasonably expected and intended to work as a proofreader for the GPO until she retired," it awarded her "front pay which reflects that the plaintiff will suffer a loss of future earnings totaling $28,594.80 per year until her projected retirement," discounted to the net present value. As Peyton was 34 years old, and her retirement was projected at age 60, the district court ultimately awarded $377,615.72 in front pay.

GPO filed the instant appeal challenging the district court's determination of compensatory damages, back pay, and front pay.

## II. Analysis

This Court reviews a district court's denial of a Rule 59(a) and (e) motion for abuse of discretion. Fed.R.Civ.P. 59(a), (e); *see Langevine v. District of Columbia,* 106 F.3d 1018, 1023 (D.C.Cir. 1997) (Rule 59(a)); *Anyanwutaku v. Moore,* 151 F.3d 1053, 1058 (D.C.Cir.1998) (Rule 59(e)). This Court also reviews equitable relief, the standard for calculating back pay and front pay, under an abuse of discretion standard. *See Barbour,* 48 F.3d

at 1277–78. A "district court has wide discretion to award equitable relief." *Id.* at 1278. "The district court should fashion this relief so as to provide a victim of employment discrimination the most complete makewhole relief possible." *Id.* In reviewing for an abuse of discretion, the Court considers "whether the decision maker failed to consider a relevant factor, whether [the decision maker] relied on an improper factor, and whether the reasons given reasonably support the conclusion." *Id.* (citation omitted). With this standard of review in mind, we consider each of the challenged awards in turn: compensatory damages; back pay; and future lost earnings or "front pay."

### A. Compensatory Damages

■ GPO argues that the denial of the motion for new trial, or remittitur, and the award of $300,000 in compensatory damages is an abuse of discretion in that a "$300,000 compensatory damages award is grossly excessive given the record in this case." Appellant relies on *Nyman v. FDIC*, 967 F.Supp. at 1570–73, for the standards that should govern remittitur in a Title VII case. In *Nyman,* the district court held that the "maximum amount recoverable under the applicable cap ... should be reserved for the most egregious cases of unlawful conduct." 967 F.Supp. at 1572. There the district court ordered remittitur of a $350,000 compensatory damages verdict to $175,000. *Id.* at 1567. Appellant essentially argues that the harm to Peyton was not serious enough to warrant the maximum penalty under the law, particularly when compared to other Title VII cases. Further, according to GPO, appellee's approach would have us consider the "quality of the 'unlawful conduct' at issue," rather than the nature of the harm suffered, conflating compensatory damages with punitive damages–damages which are foreclosed to the plaintiff as the defendant

is a government entity. *See* 42 U.S.C. § 1981a(b)(1). As to the critical inquiry of harm to the victim, appellant contends there "simply was no significant evidence of any prolonged, serious, or substantial harm to appellee stemming from GPO's actions."

■ At the outset, we address appellant's suggestion that Peyton failed to carry her burden in proving damages. Although compensatory damages must be proven and cannot be presumed, *see Carey v. Piphus*, 435 U.S. 247, 263–64, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978), there has been no such presumption here. The district court found that the jury could reasonably view this case as the type of egregious, unlawful conduct that Title VII was designed to remedy: Peyton had worked her way up the ladder at GPO, won a desirable apprenticeship, was harassed by a superior in the final months, was threatened, intimidated, physically assaulted, suffered retaliation for attempting to exercise her rights under Title VII, and was ultimately fired for exercising her rights. The evidence supports the district court's finding that she became depressed, angry, and suffered a loss of self-esteem. She was injured.

■ Thus, the only question remaining is whether it was an abuse of discretion by the district court to award the statutory maximum, $300,000 in compensatory damages, when the jury had awarded $482,000. Of course, the district court is in the best position to determine damages, as it heard all of the evidence and saw all of the witnesses. This Court will only require remittitur when (1) the verdict is beyond all reason, so as to shock the conscience, or (2) the verdict is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate. *See Jeffries v. Poto-*

*mac Dev. Corp.*, 822 F.2d 87, 96 (D.C.Cir. 1987); *Williams v. Steuart Motor Co.*, 494 F.2d 1074, 1085 (D.C.Cir.1974). The district court did not abuse its discretion in determining that neither test required remittitur here.

Appellant does not contend that an award of $300,000 "shocks the conscience" in the abstract, but rather argues, relying on the district court's opinion in *Nyman,* that 42 U.S.C. § 1981a(b) in essence requires a sliding scale. Thus, only the "most egregious cases of unlawful conduct" are entitled to the statutory maximum of $300,000, and this case is not so egregious. First, we reject the argument that § 1981a(b) itself ever requires a reduction below the $300,000 cap. By its plain language, 1981a(b)(3) does nothing other than provide a cap. Nothing in the language of that section evidences a congressional intent to specifically empower, let alone require, a trial or appellate court to reduce a verdict in excess of $300,000 to some lesser figure. Although appellant offers a plethora of cases in which smaller damage figures have been awarded, and in which remittiturs to amounts below $300,000 have been ordered, appellant provides no authority for the proposition that cases involving some perceived or even evident degree of injury less than the most egregious must inherently be awarded some figure lower than the cap. It may well be that in the most egregious conceivable case a jury might award, for example, $300,000,000, which would be reduced to $300,000. The fact that some other hypothetical case might be only half as egregious (assuming such comparisons can be made) would not require either the trial or appellate court to reduce the award in that hypothetical case from $150,000,000 to $150,000.

■ Rather, the proper approach is to determine whether the judgment awarded,

regardless of whether it is the statutory maximum, is supported by evidence, and does not shock the conscience, or is not inordinately large so as to be obviously unreasonable. *Cf. Smith v. Northwest Financial Acceptance, Inc.*, 129 F.3d 1408, 1416 (10th Cir.1997). The cases that appellant offers for purposes of comparison in which lesser damages were awarded or approved do not convince us to the contrary. In rejecting that line of argument, we find useful the reasoning of a state court considering a similar question in a different context.

> The appellant argues that a comparison of this award to other awards for similar injuries would show that this award is excessive. We stated in *Fitzsimonds v. Cogswell,* [405 P.2d 785 (Wyo.1965)], ... that "We are sure counsel realizes that there is no way of obtaining uniformity in the amount juries and trial judges may award for damages in personal-injury cases." Because of the unique circumstances of each case as well as the adjustments which would necessarily have to be made for inflation, it is awkward to discuss the size of an award through comparison with past decisions.

*Mariner v. Marsden,* 610 P.2d 6, 16 (Wyo. 1980). Just so here.

■ All, then, that is left is to assess whether the district court abused its discretion in granting a damage award of $300,000, which is $182,000 less than the jury would have awarded. It is rarely appropriate for an appellate court to reduce the trial court's determination as to the proper amount of damages. Thus, in reviewing a damage award, we consider whether it would be "a denial of justice to permit it to stand." *Grunenthal v. Long Island R. Co.,* 393 U.S. 156, 159, 89 S.Ct. 331, 333, 21 L.Ed.2d 309 (1968) (quoting *Dagnello v. Long Island R. Co.,* 289 F.2d 797, 806 (2d Cir.1961)). Given the district

court's findings of fact, which are unchallenged, we cannot say that the court abused its discretion. The court found that "Ms. Peyton presented convincing and credible evidence proving that her co-workers' and supervisors' conduct had a material effect upon her ability to perform and upon *her quality of life* in the workplace." (emphasis added). The plaintiff convinced the jury, by a preponderance of the evidence, that she had been the victim of retaliation, that she was distressed and that she was fearful about her work environment. Indeed, appellant concedes that Peyton reported "feelings of depression and sadness typical of plaintiffs in Title VII cases." Moreover, to the extent that the egregiousness of GPO's conduct was considered, it was merely as a proxy to assess the distress inflicted upon Peyton. Although we might have decided this issue differently were it before us *de novo*, because we cannot say that the district court abused its discretion, we affirm the denial of the Rule 59(a) and (e) motion, and thus allow the compensatory damage award to stand.

### B. Back Pay

 Appellant objects to the award of back pay for the August–October 1998 period, during which, it contends, Peyton failed to adequately mitigate her damages. It is not entirely clear that GPO properly preserved this issue for appeal. However, even assuming that appellant did, we find that the district court did not abuse its discretion. The employer has the burden of proving failure to mitigate. *See, e.g., Fleming v. County of Kane*, 898 F.2d 553, 560 (7th Cir.1990). GPO claims that Peyton was enrolled in school during the August–October 1998 period and did not demonstrate that she was actively seeking work. Relying on *Dailey v. Societe Generale*, 108 F.3d 451, 455–58 (2d Cir.1997), appellant contends that Peyton's school at-

tendance shows that she failed to "demonstrate at least a modicum of due diligence in pursuing full-time employment." *Dailey*, however, provides little support. There the Second Circuit rejected a *per se* rule that full-time school attendance was incompatible with the duty to mitigate, and rejected the defendant's claim that the plaintiff had failed to mitigate. *See id.* In any event, here GPO has failed to prove that Peyton was attending school *full time*, much less that she made inadequate efforts to seek employment. As the appellant has not shown that Peyton withdrew from the market and was not ready, willing, and able to accept other employment, we cannot say that the district court abused its discretion in granting back pay for the August–October 1998 period.

### C. Future Lost Earnings ("Front Pay")

 Although appellee argues that the front pay issue was not properly preserved for appeal, we agree with appellant that it was. It is clear from the district court's Memorandum Opinion filed May 24, 2000, that appellant had raised the issue of the amount of front pay to the district court: "[T]he defendant asserts ... that any front pay award in excess of a few years is unduly speculative." Thus, the question is whether the award of $377,615.72 in future lost earnings was an abuse of discretion. We determine that it was.

In *Barbour v. Merrill*, 48 F.3d 1270 (D.C.Cir.1995), *cert. dismissed*, 516 U.S. 1155, 116 S.Ct. 1037, 134 L.Ed.2d 113 (1996), we articulated factors to be considered in calculating front pay. Certain considerations "including whether an award of front pay would be 'unduly speculative,' may in some circumstances limit the court's discretion." *Id.* at 1280. "The longer a proposed front pay period, the more speculative the damages become." *McKnight v. GM*, 973 F.2d 1366, 1372 (7th

Cir.1992). Here the award of 26 years of front pay was unduly speculative and therefore an abuse of discretion. Contrary to the district court's understanding, *Barbour* does not hold that a plaintiff's intention to remain at her employer until retirement, even if that intention is entirely reasonable, automatically entitles front pay for the remainder of her work life. Rather, *Barbour* includes a list of non-exhaustive factors to consider, including age. *See Barbour,* 48 F.3d at 1280. Indeed, *Barbour* specifically suggests that the district court consider the length of time employees in similar positions stay at the defendant employer as well as at other employers, the time required to secure similar employment, and other factors. *Id.* Moreover, on remand, the district court in *Barbour* only awarded one year of front pay, which was affirmed by this Court. *See Barbour v. Merrill,* 132 F.3d 1480 (D.C.Cir.1997) (Table). Neither the district court nor appellee cites any case which suggests that an employee's subjective intent to remain at a job until retirement, *by itself,* justifies an award of front pay for the rest of her career.

While some speculation is necessary to determine front pay, here the appellee produced no expert testimony concerning her earning potential, nor did the district court examine what positions were available in the private sector comparable to a journeyman proofreader position at GPO. "The plaintiff bears the initial burden of providing the district court 'with the essential data necessary to calculate a reasonably certain front pay award.'" *Barbour,* 48 F.3d at 1279 (quoting *McKnight,* 973 F.2d at 1372). However, here the district court simply calculated the difference between pay at Bowne and GPO, and assumed that appellee would have stayed at Bowne for the rest of her career. In fact, Peyton had only been working at Bowne a little over a month when the trial began.

Further, the district court took "judicial notice that Ms. Peyton can expect to receive regular and incremental increases in compensation as an employee of Bowne, Inc., as she would have as an employee of the GPO." But the evidence does not reflect how such increases would compare between the public and private sectors. Moreover, there is no evidence in the record that salaries at Bowne represent a "fair sample of the market" or the industry standard in the private sector. Nor does evidence in the record support the finding that the GPO proofreading job provided Peyton an "optimum and unparalleled occasion to earn a handsome living." Appellee's assertion that the GPO position "was an unusually high paying job" is also without basis. Indeed, none of the citations to the Joint Appendix in her brief support appellee's claim that her witnesses "testified about the uncommonly high compensation for the GPO position." Finally, appellee does not substantiate her claim that she is not generally able to "pursue jobs in the future that will be essentially comparable to the job she lost." In sum, we cannot uphold the determination of front pay.

The Ninth Circuit's decision in *Gotthardt v. National RR. Passenger Corp.,* 191 F.3d 1148 (9th Cir.1999), does not alter our analysis. That case involved a 59 year-old employee approaching retirement who had been truly incapacitated by the employer's wrongful conduct and could not enter another career. *See id.* at 1156. Given those circumstances, the Ninth Circuit upheld a front pay award that compensated future lost earnings through the mandatory retirement age of 70: "Although an eleven-year front pay award seems generous, the district court explicitly found that Gotthardt would be unable to work in the future, taking into account her age (59), her educational and vocational background, and, especially, her health."

*Id.* at 1157. The *Gotthardt* court noted that these were unique circumstances, because "front pay is intended to be temporary in nature." *Id.* (quoting *Cassino v. Reichhold Chemicals, Inc.,* 817 F.2d 1338, 1347 (9th Cir.1987)). Similarly, in *Davis v. Combustion Engineering, Inc.,* 742 F.2d 916, 923 (6th Cir.1984), the Sixth Circuit upheld an award of front pay to a 59 year-old plaintiff but noted that front pay for a 41 year-old plaintiff until retirement age might be unwarranted. Indeed, "[o]ther courts seem to agree that plaintiffs in their forties are too young for lifetime front pay awards." *Stafford v. Electronic Data Systems Corp.,* 749 F.Supp. 781, 789 (E.D.Mich.1990) (citing *Bailey v. Container Corporation of America,* 660 F.Supp. 1048 (S.D.Ohio 1986); *Foit v. Suburban Bancorp,* 549 F.Supp. 264, 267 (D.Md. 1982); *Monroe v. Penn–Dixie Cement Corp.,* 335 F.Supp. 231, 235 (N.D. Ga.1971)).

To award Peyton front pay based on the assumption that she will continue in an allegedly low-paying job (compared to a journeyman proofreader at GPO) for a full career, when she is only 34 years old and not incapacitated, is to give her a tremendous windfall rather than to make her whole. There is no reason to assume that if she is, in fact, qualified for a high-paying job at GPO, she will not be able to find a high-paying job in the future. Perhaps she will not. Perhaps private printers systemically pay less for the work she was training to do. However, the district court cannot make this determination solely on the basis of appellee's one month of experience at a private employer that may, or may not, be representative of the private sector, doing work that may, or may not, be comparable to the work of a journeyman proofreader at GPO. The record does not support such a speculative conclusion. Accordingly, we vacate the district court's award of $377,615.72 in future lost earnings, and remand for proceedings consistent with this opinion.

### III. Conclusion

The district court did not abuse its discretion in denying the Rule 59(a) and (e) motion for a new trial, or in the alternative, remittitur. Therefore we affirm the award of $300,000 in compensatory damages. Nor did the district court abuse its discretion in awarding $78,476.90 as back pay. However, because the award of $377,615.72 in future lost earnings was based on undue speculation, it was an abuse of discretion, requiring reversal. We vacate the district court's award of front pay and remand for proceedings consistent with this opinion.